**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2363-22

W.A. JR.,

     Plaintiff-Respondent,

v.

S.T.,

     Defendant-Appellant.

_____

Submitted September 16, 2024 – Decided November 21, 2024

Before Judges Susswein and Perez Friscia.

On appeal from the Superior Court of New Jersey, Union County, Chancery Division, Family Part, Docket No. FD-20-0856-11.

A. Brown, Esq. LLC, attorneys for appellant (Adam Clinton Brown, on the brief).

J. Saad Law Group LLC, attorney for respondent (Jason S. Saad, on the brief).

PER CURIAM

This appeal arises from a custody dispute over the primary residence of the parties' teenage son, J.T.[1] Defendant S.T. (J.T.'s mother) appeals a March 3, 2023 Family Part order denying reconsideration of the trial court's September 2, 2022 order granting plaintiff W.A. (J.T.'s father) primary residential custody. J.T., who suffers from attention-deficit/hyperactivity disorder (ADHD), had primarily resided with his mother since birth. She argues the trial court abused its discretion by changing primary residential custody and asks us to vacate the order and remand the case to a new judge. After carefully reviewing the record in light of the parties' arguments and the governing legal principles, we conclude defendant has not established the trial court abused its discretion. Accordingly, we affirm.

I.

We discern the following procedural history and pertinent facts from the record. On February 8, 2022, the parties appeared before the trial court on plaintiff's motion to modify child support based on his new job. Plaintiff also moved to be designated the parent of primary residence and to relocate J.T. from defendant's residence in one town to plaintiff's home in another town.

---

[1] We use initials to protect privacy. R. 1:38-3(d).

On February 11, 2022, the trial court entered an order setting new child support payments. The trial court further ordered defendant to provide additional information about J.T.'s medical insurance and instructed both parties to provide photographic evidence of their homes and to exchange school comparisons from Niche.[2] The order expressly permitted defendant to "submit anything she wishes . . . regarding reasons for why the child should remain in her residential custody."

The trial court held a plenary hearing on August 30, 2022. We recount the pertinent testimony as summarized in the trial court's findings set forth in its written opinion.

Plaintiff testified he lives with his wife and stepdaughter. They share a three-bedroom home. Plaintiff moved to his current residence because it has a "better" school system, including afterschool programs, extracurricular activities, special education programs, and summer camps. He represented that "he could offer a superior upbringing for [J.T.], because he would provide structure, a stable home would be able to expose the child to more sports, and the child would go regularly to church on Sundays."

---

[2] The Niche K-12 Compare Tool compares New Jersey schools based on reviews, statistics, and ratings.

A-2363-22

Plaintiff expressed concern about the crowded living arrangements at defendant's residence. He testified defendant "lacks financial and emotion[al] stability because she has moved three times in the past three years." He explained that if J.T. relocated to his home, J.T. would live in the upstairs attic bedroom and potentially share it with his stepsister with a partition. Alternatively, the stepsister will move downstairs into the secondary room.

Plaintiff acknowledged that he has an unpredictable schedule working at the Port of Newark. He explained that his wife would be the main provider of childcare for J.T. because she has flexible work hours as a dance studio owner. He also testified his wife normally starts work at 4:30 p.m. and the dance studio is less than a mile from their house.

Commenting on J.T.'s reading difficulties, plaintiff predicted that J.T.'s grades would improve if he were relocated to the school district in plaintiff's town. Plaintiff explained that he too suffers from ADHD and is a "visual learner." He testified that because he can relate "to his son's affliction he would be a better fit for his learning environment."

Plaintiff's wife testified she married plaintiff in November 2018, and she is pregnant with their daughter due in late September 2022.[3] Her then-twelve-

---

[3] The record does not provide updated information.

 A-2363-22

year-old daughter was from a different relationship. She confirmed plaintiff's testimony that her daughter could move downstairs if necessary.

Plaintiff's wife testified she gets along well with J.T. and has no issues taking on the role of a parent of primary residence. She explained that "she comes from a big family and enjoys working with children." Further, she stated that J.T. has participated in her dance studio's summer programs and that he enjoys them.

Defendant testified she works part-time at an engineering firm. She typically works Monday through Friday 7:00 a.m. to 2:30 p.m. Since February 2022, defendant has also had an event planning business, with events primarily on Fridays, Saturdays, and Sundays. She acknowledged that she has had five jobs in five years.

In addition, defendant confirmed she has lived at her current residence with her mother for approximately one year. Defendant denied that her mother's friend, Bill or "Coach," lives with them. Before moving to her current residence, she lived on another street in her current town for about two years. Before that, she lived in another town for approximately three and a half years. Defendant testified she left that town because J.T. was not doing well in that school system.

A-2363-22

Defendant acknowledged that J.T. does not have his own bedroom and sleeps on a fold-out bed in the living room. She noted that J.T. occasionally sleeps in his uncle's room which has bunk beds. Defendant admitted that J.T. does not have privacy when he sleeps in the living room, especially if someone uses the kitchen at night.

Defendant also stated that she does not have her own bed or bedroom. She sleeps in the living room or shares the bedroom with her mother. When asked why she is still living at her mother's home, defendant testified that "she had tried to bid on homes but was outbid consistently," so she decided to invest the money in her event planning company. She testified she planned to move out next month but is unsure what town or area she is moving to.[4]

J.T. attended middle school in defendant's town with a basic education curriculum but has special education classes for reading. He has lived with defendant since birth but spends four weeks each summer with plaintiff. Defendant acknowledged that in November 2020, J.T. lived with plaintiff for approximately one month because of behavioral concerns.[5] Defendant asserted

---

[4] We reiterate the record does not reflect any changed circumstances that occurred following the plenary hearing.

[5] Plaintiff claims J.T. lived with him for two to three months during this period.

she "is better suited to love and care for" J.T., claiming she "has a special relationship with the child and helps the child with his schoolwork."

Defendant disagreed with the ADHD and oppositional defiant disorder diagnoses by Dr. Kavita Sinha, a doctor employed by the public school in defendant's town. She believes those diagnoses are "primarily the result of input from the schoolteachers" and are not valid. She acknowledged, however, that Dr. Sinha has been involved in J.T.'s medical care and monitoring his needs since the first grade.

Defendant discussed her compliance with Dr. Sinha's seven recommendations. Defendant acknowledged she is not following recommendations two, four, five, six, and seven, which recommended daily vitamins, informational reading, and behavioral modification. She testified she is following the first recommendation—"the educational placement as per the child's study team." She claimed she also is following the third recommendation—J.T. undergo medical testing. She admitted, however, that J.T. had not undergone any blood tests.

She also testified regarding the recommendation that J.T. consult with a private psychologist for proper behavioral management strategies. She stated J.T. attended some psychological evaluations, but explained that she wanted J.T.

A-2363-22

to see psychologists that she and J.T. already knew, none of which were available due to an insurance coverage issue.

During cross examination, defendant admitted she never received a denial of coverage from her insurance company and in fact never called the insurance company. She testified J.T.'s "low" and "low-average" school performance was related to COVID-19 but did not explain his school performance issues before the pandemic.

J.T.'s maternal grandmother testified that J.T. "is better off staying with them because he does not deal well with change." She confirmed that defendant sometimes sleeps with her and that J.T. sleeps in the living room on a fold-out mattress.

On August 31, 2022, the day after the plenary hearing, the trial court conducted an in-camera interview of J.T. Before the interview, the trial court allowed the parties to submit questions.

The trial court found J.T. "knew the difference between a truth and a lie" and "testified consistently" with defendant's testimony regarding his living arrangements. The trial court found:

> The minor appeared not to be concerned about the living arrangements and apparently has adopted a position that privacy while at his mother's home is not a concern. Conversely, when asked about privacy at his

father's home, he seemed to indicate that it was a concern. The minor expressed discontent about the fact that he had to share a bedroom with his step-sister. Minor expressed concerns about boundaries within the large bedroom in that sometimes the stepsister's belonging[s] made it to his side. When offered multiple alternatives to solutions to the privacy concern about the bedroom he seemed extremely reluctant but later conceded that perhaps a center divider would resolve the issue.

J.T. testified his mother does not want to put him in special education courses even though he feels at a disadvantage going to regular classes. He studies with his mother, who often assigns him additional homework. J.T. acknowledged that he has a hyperactivity issue and that karate is helpful to him since it "gets his energy out." He added that "when he gets hyper, … his mother gets hyper with him." J.T. indicated he enjoys being with his mother and spending time with his uncle. He did not seek more parenting time with his father.

On September 2, 2022, the trial court issued an order granting plaintiff primary residential custody accompanied by a thirty-five-page written opinion. On September 22, 2022, defendant filed a motion for reconsideration, arguing the trial court erred by not addressing J.T.'s psychological needs, relying too heavily on Dr. Sinha's report, ignoring J.T.'s preference to continue living with her, and delegating the responsibility of raising J.T. to plaintiff's wife. She

A-2363-22

argued that it was not in J.T.'s best interest to share a room with "a maturing twelve-year-old girl, who[J.T.] said he does not really know well." She asked the trial court to vacate its September 2 order and allow her to "retain an expert to opine" about J.T.'s health and schooling.

The trial court heard oral argument on defendant's reconsideration motion on January 3, 2023. On March 3, 2023, the trial court issued a twenty-two-page written opinion denying the motion. This appeal followed. Defendant raises the following contentions for our consideration:

> POINT I
>
> The trial court abused its discretion in its analysis of the best interest factors.
>
> a. The trial court deprived the [r]espondent of due process by placing too much weight [on] recommendations in an Individualized Education Plan ("IEP"), without specifying its purpose of admission.
>
> b. Because the trial court did not consider the totality of probative competent evidence by concluding child's preference was unduly influenced by [r]espondent's statements, it abused its discretion in making its finding.
>
> c. Because the trial court incorrectly discounted the [a]ppellant's efforts to obtain financial help and avail herself of [r]espondent's insurance in November, 2021, it abused its discretion in its

finding [r]espondent demonstrated an inability to meet the child's needs.

d. Because the trial court did not have sufficient facts to show [a]ppellant's employment responsibilities were not J.T. centered, and it ignored material facts regarding [r]espondent's employment responsibilities.

e. Because the trial court improperly formed an opinion based on facts not in evidence, it unfairly prejudiced the [a]ppellant, it showed bias, and it abused its discretion by relying on "state foster care requirements."

f. Because the trial court gave too much weight to the idea of the "nuclear family" in [r]espondent's home, it abused its discretion and showed bias toward [a]ppellant's household.

POINT II

The trial court showed bias by improperly relying on evidence that was never submitted at trial, and by making inaccurate assumptions it saw fit to craft its order related to alleged foster care requirements.

II.

We preface our analysis by acknowledging the legal principles governing this appeal. We review a trial court's decision on whether to grant or deny a motion for rehearing or reconsideration under Rule 4:49-2 (motion to alter or amend a judgment order) for an abuse of discretion. Branch v. Cream-O-Land Dairy, 244 N.J. 567, 582 (2021); see Kornbleuth v. Westover, 241 N.J. 289, 301

11

(2020). As we recently reaffirmed, our "standard of review on a motion for reconsideration is deferential." Castano v. Augustine, 475 N.J. Super. 71, 78 (App. Div. 2023). "Reconsideration is appropriate only in 'those cases which fall into that narrow corridor in which either 1) the [c]ourt has expressed its decision based upon a palpably incorrect or irrational basis, or 2) it is obvious that the [c]ourt either did not consider, or failed to appreciate the significance of probative, competent evidence . . . ." Ibid. (quoting Triffin v. SHS Grp., LLC, 466 N.J. Super. 460, 466 (App. Div. 2021)). Stated another way, "the magnitude of the error cited must be a game-changer." Ibid. (quoting Palombi v. Palombi, 414 N.J. Super. 274, 289 (App. Div. 2010)).

Appellate courts also defer to a trial court's findings of fact "when supported by adequate, substantial, credible evidence." Cesare v. Cesare, 154 N.J. 394, 411-12 (1998). We are especially deferential to fact-sensitive determinations made by Family Part judges "[b]ecause of the family courts' special jurisdiction and expertise in family matters." Id. at 413; see also Thieme v. Aucoin-Thieme, 227 N.J. 269, 282-83 (2016).

Turning to substantive legal principles, it is well settled that in custody cases, the primary consideration is the best interests of the child. Kinsella v. Kinsella, 150 N.J. 276, 317 (1997). The court must focus on the "safety,

happiness, physical, mental and moral welfare" of the child. <u>Fantony v. Fantony</u>, 21 N.J. 525, 536 (1956); <u>see</u> <u>P.T. v. M.S.</u>, 325 N.J. Super. 193, 215 (App. Div. 1999).

Custody issues are resolved using a "best interests" analysis that gives weight to factors set forth in N.J.S.A. 9:2-4(c). <u>V.C. v. M.J.B.</u>, 163 N.J. 200, 227-28 (2000). The statutorily-enumerated factors are:

> the parents' ability to agree, communicate and cooperate in matters relating to the child; the parents' willingness to accept custody and any history of unwillingness to allow parenting time not based on substantiated abuse; the interaction and relationship of the child with its parents and siblings; the history of domestic violence, if any; the safety of the child and the safety of either parent from physical abuse by the other parent; the preference of the child when of sufficient age and capacity to reason so as to form an intelligent decision; the needs of the child; the stability of the home environment offered; the quality and continuity of the child's education; the fitness of the parents; the geographical proximity of the parents' homes; the extent and quality of the time spent with the child prior to or subsequent to the separation; the parents' employment responsibilities; and the age and number of the children.
>
> [N.J.S.A. 9:2-4(c).]

III.

In the present matter, the trial court addressed all fourteen custody factors. We highlight the trial court's findings with respect to the statutory factors most pertinent to the issues raised on appeal.

Regarding factor three, interaction and relationship of the child with their parents and siblings, the trial court recognized the "strong emotional attachment between" defendant and J.T. J.T. "enjoys spending time with his mother despite the fact that his housing environment is inadequate." Further, the trial court found "it was apparent that many of [J.T.]'s responses were influenced by the mother's perspective on the father." However, J.T. "welcomes his relationship with his father . . . [and] the relationship between [J.T.] and his step sister is a positive one."

As to factor six, preference of the child when of sufficient age and capacity to reason to form an intelligent decision, the trial court stated:

> Overall, this court believes that this minor lacked the proper insight to determine the difference between his lack of privacy in [defendant's] residence, as compared to the lack of privacy allegedly at [plaintiff's] residence . . .
> This court got the impression that the minor may have been significantly influenced by his mother, particularly during the exchange pertaining to the father allegedly blocking calls from the mother. Moreover, the minor had a hard time conceding the issue of lack

14

of privacy despite the fact that he sleeps in an[] open living room area.  This court believes that the child has been accustomed to living [in] inadequate housing and as such his preference to remain with his mother, shall not be given any greater weight.  This opinion is rooted in the fact that the child has been living in these conditions for a protracted period of time.

This court's opinion that [defendant's] home is inadequate, it is partially based on the state's basic foster care requirements, and believes that [defendant's] home would not be adequate under said standards, since [] the child does not have his own room, bed, and a sense of belonging, in terms of having a sanctuary within [defendant's] residence.  Moreover, the [dining] area has been converted into an office.  This is in stark contrast to [plaintiff's] home, in which the minor was allowed to select the color of his side of his room, which runs the length of the entire home.

Regarding factor seven, needs of the child, the trial court noted defendant "was in denial as it relates to" J.T.'s ADHD diagnosis.  Defendant's testimony that she believed Dr. Sinha's seven recommendations were "merely based off of incorrect teacher input demonstrates a lack of insight and[/]or unwillingness to meet [J.T.]'s needs."

As to factor eight, stability of home environment offered, the trial court found plaintiff "offers a more stable home environment."  It explained:

The father owns a home, his [wife runs a] business about a mile away, and they enjoy a nuclear family.  Moreover, father[']s wife is due to give birth in a couple of weeks.  This court believes that the father's nuclear family and home environment offers [J.T. an]

15

increased stability as compared to the mother[']s home environment, which can best be described as cluttered, unstable, and [unpredictable].

As to factor nine, quality and continuity of the child's education, the trial court found:

This court is troubled by [defendant]'s lack of insight and inability and[/]or unwillingness to gain such an insight regarding her child['s] diagnosis. This court believes [that if J.T. is] left in the care and custody of defendant mother, [that] said arrangement will continue to have an adverse effect on the child's educational needs. The continuity of the child's education currently is simply not meeting the child['s] needs and this court does not believe that [defendant] has an interest in changing the current arrangement.

## IV.

Defendant contends the trial court deprived her of due process by not affording her the opportunity to submit a psychological evaluation tailored to address the residential custody decision. Relatedly, she claims the trial court "plac[ed] too much weight on recommendations in an Individualized Education Plan (IEP)[6], without specifying its purpose of admission." She claims the report "was only submitted simply to show [the] child went to a school psychologist, who diagnosed him with ADHD." The gravamen of her argument is that the IEP

---

[6] The IEP requires J.T. to attend smaller classes.

16

and Dr. Sinha's recommendations are inadequate substitutes for a professional custody evaluation.

The record shows that on February 11, 2022, the trial court ordered defendant to provide plaintiff "proof that the child has been diagnosed with ADHD, and written proof that said condition is limited by [N.J.] Cares insurance to one visit per month" within seven days.[7] The February 11 order further stated that defendant "shall submit anything she wishes, to this court, regarding reasons for why the child should remain in her residential custody and not [be] transferred to the custody of [plaintiff]. [Plaintiff's] counsel may also supplement his submission to the court." The parties had until February 14, 2022 to provide the additional information to the court and each other.[8]

Defendant provided two documents to the trial court concerning J.T.'s ADHD diagnosis: the IEP and Dr. Sinha's report. She did not provide any

---

[7] Defendant had claimed that her insurance limited J.T.'s coverage to one therapy session per month.

[8] We note defendant asserts on appeal "the only court date prior to the plenary hearing was this May 10, 2022 hearing where there was no definitive answer as to whether a plenary hearing will be scheduled. There was merely tentative dates and requests for email submissions from the court of evidence it felt was necessary. No formal discovery schedule [was] ever given."

additional reports or documents. Nor did she provide any additional reports or documents in support of her motion for reconsideration.

In denying the reconsideration motion, the trial court noted defendant:

> has not presented any good reason for the court to reconsider new evidence. The evidence [defendant] wishes to rebut was provided by her during the course of discovery and was deemed relevant by this court. At no time did she nor her counsel, request withdrawal of said report [nor] an opportunity to rebut and[\]or temper said evidence. Moreover, the alleged opinion of Dr. Gill,[9] that [defendant] claimed exist[s], was not referenced during the trial nor provided to this court at this motion.

Defendant argues the IEP "is starkly different from a best interest evaluation by an expert." She asserts, "[a]fter being confronted with evidence from Dr. Sinha that those recommendations were not narrowly tailored, essentially given to all parents, and not specific to J.T.," the court never allowed her "the opportunity to supplement the report with an actual best interest analysis." The record does not support that contention. Defendant had ample opportunity to retain a custody expert or to ask the court to appoint one. More

---

[9] Defendant referenced Dr. Gill in her certification for the motion to reconsider stating he "opined that no medication was needed for [J.T.]"

than six months elapsed between the trial court's February 11, 2022 order and the plenary hearing.

That said, we agree with defendant that an IEP serves a very different purpose than a best interests evaluation. An IEP is "a written plan which sets forth present levels of academic achievement and functional performance, measurable annual goals, and short-term objectives or benchmarks, and describes an integrated, sequential program of individually designed instructional activities and related services necessary to achieve the stated goals and objectives." N.J.S.A. 30:4-165.8(b). In contrast, a custody evaluation "is an expert report where the court expects, and is assisted by, the independent professional judgment of a licensed mental health expert." Koch v. Koch, 424 N.J. Super. 542, 550 (Ch. Div. 2011).

It would have been preferable if the trial court had the benefit of a professional best interests evaluation to provide a neutral mental health assessment to inform the court's exercise of discretion. See Rule 5:3-3(b). In Kinsella, our Supreme Court acknowledged that "[i]n implementing the 'best-interest-of-the-child' standard, courts rely heavily on the expertise of psychologists and other mental health professionals." 150 N.J. at 318. The Court stressed the importance of mental health experts in custody disputes,

embracing our opinion in <u>Fehnel v. Fehnel</u>, where we held the trial court should have granted an adjournment for the parties to obtain expert psychological witnesses once it became evident, shortly before trial, that a true dispute over custody existed.  186 N.J. Super. 209, 215-16 (1982).   The <u>Kinsella</u> Court quoted extensively from Judge Pressler's opinion in <u>Fehnel</u>, where she explained:

> There are obviously few judicial tasks which involve the application of greater sensitivity, delicacy and discretion than the adjudication of child custody disputes, which result in greater impact on the lives of those affected by the adjudication, and which require a higher degree of attention to the properly considered views of professionals in other disciplines.  That is why a probation department investigation and report is mandated by <u>R.</u> 4:79-8(a).  That is also why the parties must be afforded every reasonable opportunity to introduce expert witnesses whose evaluation of the family situation may assist the judge in determining what is best for the children.  There have been frequent doubts expressed regarding the viability of the traditional adversarial process as an appropriate dispute resolution technique in child custody cases.  But as long as we continue to resort to that process, it must be permitted to function consistently with its highest potentials.
>
> [150 N.J. at 319 (quoting <u>Fehnel</u>, 186 N.J. Super. at 215).]

But in the matter before us, defendant never sought to obtain an expert report and never asked for an adjournment to retain an expert even as she moved

for reconsideration based, in part, on the trial court's reliance on the IEP and Dr. Sinha's report.  Moreover, defendant cites no authority for the proposition that a professional best interests evaluation is required in all custody disputes.[10]  We therefore do not believe her due process rights were violated.  Nor are we persuaded the trial court abused its discretion in the manner in which it made use of the IEP and Dr. Sinha's report as part of its best interests analysis.

V.

In sum, accounting for the deference we owe to Family Part decisions, we are not persuaded that the trial court abused its discretion in weighing the statutory best interests factors based on the testimony and evidence adduced at the plenary hearing, and we decline to substitute our judgment for the trial court's.  To the extent we have not specifically addressed them, defendant's

---

[10]  We note that Rule 5:8-1 provides in pertinent part that when mediation fails, a court in its discretion may order "an investigation to be made by the Family Division of the character and fitness of the parties, the economic condition of the family, the financial ability of the party to pay alimony or support or both, and the parties' homes, which shall be limited to a factual description of the home where the child will reside or visit, appropriate child safety precautions in the home, number of household members and their relationship to the child, and criminal record checks for both parties."  See also Administrative Office of the Courts, Family – Revised Standards for Child Custody and Parenting Time Investigation Reports (June 21, 2019) (Directive #12-19) (promulgating revised standards for Custody and Parenting Time Investigation Reports to "provide statewide uniformity and clarity as to . . . the situations appropriate for ordering . . . such reports").

remaining arguments, including her contention that the trial court was biased against her, lack sufficient merit to warrant discussion. See Rule 2:11-3(e)(1)(E).

We conclude by reminding the parties that custody determinations are not chiseled in granite. Indeed, this appeal arises from a party's motion to switch the primary residence parent. Either party may exercise their right to seek modification of the residential custody arrangement based on updated information pertaining to the best interests of the child.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION